# UNEMPLOYMENT COMPENSATION COMMISSION OF ALASKA ET AL. *v.* ARAGON ET AL.

No. 25.   Argued February 27, 1946.   Reargued November 13, 1946.— Decided December 9, 1946.

144

*Marshall P. Madison* argued the cause for petitioners. With him on the briefs were *E. Coke Hill* and *Francis R. Kirkham*.

*Herbert Resner* argued the cause and filed a brief for respondents.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

In May, 1940, the individual respondents filed claims for unemployment benefits with the Unemployment Compensation Commission of the Territory of Alaska. After an initial determination by an examiner and after decision by a referee, the Commission held that the claimants were disqualified from receiving benefits for a period of eight weeks, since their unemployment was due to a labor dispute in active progress within the meaning of the Alaska Unemployment Compensation Law.[1] The United States District Court affirmed the Commission's holding in all particulars. The Circuit Court of Appeals reversed, one judge dissenting. We granted certiorari because of the public importance of the questions involved.[2]

---

[1] Extraordinary Session Laws of Alaska, 1937, Chapter 4 as amended by Chapters 1 and 51, Session Laws of Alaska, 1939.

[2] The Alaska statute is part of the legislative scheme for unemployment compensation induced by the provisions of the Social Security Act of 1935. 49 Stat. 620, 626–627, 640. It is said that forty-three

Among the petitioners are three corporations engaged principally in the business of salmon fishing, canning, and marketing. One of the companies owns canneries and other facilities at Karluk, Chignik, and Bristol Bay, Alaska. The other two companies operate only at Bristol Bay. Catching and canning salmon is a seasonal activity.[3] The companies customarily hire workers at San Francisco at the beginning of the season, transport them to the Alaskan establishments, and return them to San Francisco at the season's end. Similar operations are carried on by other companies out of other west coast ports, notably Seattle and Portland. The individual respondents are all members of the Alaska Cannery Workers Union Local No. 5, and each worked in Alaska for one of the three companies during the 1939 season. Local No. 5 is the recognized bargaining agent of the cannery workers in the San Francisco area.

In 1939, as had been the practice for some years, the union entered into a written agreement with the companies, covering in considerable detail the matters of wages, hours, conditions of employment, and the like. After the end of the 1939 season, the companies terminated the agreement then in effect, which made necessary the negotiation of a new contract for the 1940 season. Consequently, on March 6, 1940, the companies through their authorized agent, Alaska Salmon Industry, Inc., invited the union to enter into negotiations for a new agreement. In a series of meetings held shortly thereafter, serious disagreement

states and territories have provisions similar to those in the Alaska law disqualifying from unemployment benefits persons unemployed due to a labor dispute.

[3] As provided by Benefit Regulation No. 10 of the Alaska Unemployment Compensation Commission, the season at Karluk extends from April 5 to September 5, at Chignik from April 1 to September 10, and at Bristol Bay from May 5 to August 25.

appeared which quickly developed into an impasse on the question of wages. The union demanded wages equal to or in excess of those paid under the terms of the 1939 agreement. The companies offered wages which for the most part were below those paid in 1939. On April 1, 1940, the union caused the negotiations as to the wage issue to be transferred from San Francisco to Seattle, where an attempt was being made to effect a coastwide agreement to cover all west coast companies carrying on salmon operations in Alaska. Local No. 5, however, refused to sign a "memorandum" agreement incorporating such terms as might result from the concurrent Seattle negotiations.

On April 3, the companies notified the union that if operations were to be carried on in Karluk and Chignik during the 1940 season, an agreement with respect to the former would have to be reached by April 10 and with respect to the latter by April 12. Although negotiations proceeded up to the deadlines, the parties arrived at no understanding, and on April 22 Alaska Salmon Industry, Inc., formally announced that no operations would be carried on in Karluk and Chignik during 1940. Meetings continued, however, in an effort to come to an understanding with respect to Bristol Bay before the arrival of the May 3d deadline which had been set for those operations. Although federal mediators intervened in an attempt to discover a suitable compromise, the deadline date passed without agreement. It appears that, after May 3, negotiations continued in Seattle, where a contract affecting only canners and workers operating out of ports other than San Francisco was finally executed on May 29. The companies and union which are involved in this case were specifically excluded from the terms of the 1940 Seattle agreement.

Shortly after May 3, the individual respondents filed claims for unemployment benefits with the Alaska Unem-

ployment Compensation Commission. The Commission, acting through an examiner, held that respondents were disqualified from receiving payments for the statutory period of eight weeks under the provisions of § 5 (d) of the Alaska law. At the time this case arose, that section stated in part: "An individual shall be disqualified for benefits . . . (d) For any week with respect to which the Commission finds that his total or partial unemployment is due to a labor dispute which is in active progress at the factory, establishment or other premises at which he is or was last employed; provided, that such disqualification shall not exceed the 8 weeks immediately following the beginning of such dispute . . ."

In pursuance of the appeal provisions of the statute,[4] respondents asked for a review of the examiner's determination. The Commission, in response to this application, appointed a Referee to pass on the disputed claims. The scope of the hearings was confined to the issue of whether the unemployment of the claimants was caused by the existence of a labor dispute. At the end of the proceedings, the Referee came to the conclusion that, although there was a labor dispute in existence initially, the dispute was no longer "in active progress" after the passing of the dates fixed by the companies for consummation of the working agreements. Consequently, the disqualification under § 5 (d) with respect to each of the localities was held no longer to attach after the passage of the respective deadline dates.[5]

[4] Section 6 (c) and § 6 (d), Chapter 1, Session Laws of Alaska, 1939.

[5] The Referee found that there had been unemployment due to a labor dispute in active progress at Karluk from April 5, when the season opened, to April 10, the deadline date, and at Chignik from April 1 to April 12. Since the deadline date with respect to Bristol Bay was set two days before the season opened there, the Referee found that there was no dispute in active progress at those plants.

The Commission, on appeal,[6] reversed the Referee's decision and held that, within the meaning of the Alaska law, a labor dispute was in active progress throughout the entire eight-week statutory period of disqualification beginning with the opening of the season in each locality. Consequently, no benefits were payable until the expiration of the disqualification period. The United States District Court affirmed the Commission's decision in all particulars.[7] The Circuit Court of Appeals, with one judge dissenting, reversed, however, on the ground that the labor dispute was not physically *at* the Alaska canneries where the individual respondents had been last employed.

We are met at the outset with the contention that the facts of this case do not present a "labor dispute" within the meaning of § 5 (d) of the Alaska Act. Respondents urge that the term must be narrowly construed to require a strike or leaving of employment which, in turn, calls for a presently-existing employment relation at the time the dispute arises.[8] According to this view, the term

[6] This procedure was in pursuance of § 6 (e) of the Act as amended by Chapter 1, Session Laws of Alaska, 1939.

[7] Section 6 (i) of the Act provides that within thirty days after the decision of the Commission has become final, any party aggrieved may secure judicial review in the United States District Court. The section states, "In any judicial proceeding under this Section, the findings of the Commission as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said Court shall be confined to questions of law."

[8] A number of state courts in construing similar legislation have found "labor disputes" to have existed in situations where no contractual employment relation presently existed. Each of these cases involved a work stoppage in the interval between the expiration of an old labor contract and the consummation of a new agreement. *Miners in General Group* v. *Hix*, 123 W. Va. 637, 17 S. E. 2d 810 (1941); *Ex parte Pesnell*, 240 Ala. 457, 199 So. 726 (1940); *Barnes* v. *Hall*, 285 Ky. 160, 146 S. W. 2d 929 (1940); *Block Coal & Coke Co.*

would not cover a situation, such as presented here, where the controversy precedes the employment. Respondents would justify this restricted construction on the ground that the Unemployment Compensation Law is remedial legislation, and any provision limiting benefits under the Act should be narrowly interpreted.

The term "labor dispute" is not defined in the statute. The term appears in the Act in one other connection, however. Section 5 (c) (2) (A) provides that benefits under the Act will not be denied any individual, otherwise eligible, who refuses to accept new work "if the position offered is vacant due directly to a strike, lockout, *or other labor dispute.*" The Social Security Act of 1935 [9] requires that the state or territorial law contain a provision to this effect before the legislation can be approved by the Social Security Board. Obviously, for the purposes of § 5 (c)(2)(A), the term, "labor dispute," has a broader meaning than that attributed to it by respondents. Unless the Territorial Legislature intended to give a different meaning to the same language appearing in another subdivision of the same section, the term must be given a broader meaning than that contended for by the respondents, for the purposes of § 5 (d) as well. We need not determine whether "labor dispute" must in all cases be construed as broadly as it is defined in the Norris-LaGuardia Act [10] and the

---

v. *United Mine Workers of America,* 177 Tenn. 247, 148 S. W. 2d 364, 149 S. W. 2d 469 (1941); *Sandoval* v. *Industrial Comm'n,* 110 Colo. 108, 130 P. 2d 930 (1942).

[9] 49 Stat. 640, 26 U. S. C. § 1603 (5) (A).

[10] 47 Stat. 70, 29 U. S. C. § 101. The Norris-LaGuardia Act contains the following definition: "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 47 Stat. 73, 29 U. S. C. § 113 (c). A number of state courts have found this

National Labor Relations Act.[11]   But here there was full-scale controversy.   Companies engaged in carrying on a seasonal business were ranged against a union represent-ing seasonal workers who had been employed by the com-panies in the previous year.   Dispute there certainly was; and the subject of that dispute consisted of matters usually contested in labor disputes as that term is normally under-stood.[12]   Since we find nothing to indicate that the Ter-ritorial Legislature intended a contrary result, we con-clude that the Commission might properly find a "labor dispute" here presented within the meaning of § 5 (d) of the Alaska Act.

We think that there is evidence in the record to support the Commission's conclusion that respondents' unemploy-ment was "due" to a labor dispute insofar as that holding relates to the individual respondents employed in 1939 by the Alaska Packers Association and the Red Salmon Canning Company.   At the hearings before the Referee, the respondents attempted to establish that the compa-nies called off their 1940 operations for reasons other than their inability to negotiate a satisfactory labor agreement. It was argued, for example, that the companies feared a poor catch as a result of governmental restrictions on fish-ing applicable to the 1940 season.   The evidence adduced

and the similar definition in the National Labor Relations Act per-suasive in their construction of the term appearing in unemployment compensation legislation similar to the Alaska Act.   *Miners in General Group* v. *Hix,* 123 W. Va. 637, 17 S. E. 2d 810 (1941); *Barnes* v. *Hall,* 285 Ky. 160, 146 S. W. 2d 929 (1940); *Ex parte Pesnell,* 240 Ala. 457, 199 So. 726 (1940); *Sandoval* v. *Industrial Comm'n,* 110 Colo. 108, 130 P. 2d 930 (1942).   The Alabama legislature incorpo-rated the definition appearing in the Norris-LaGuardia Act into the Alabama unemployment compensation act.   Ala. Code, Tit. 26 § 214 (A).

[11] 49 Stat. 449, 29 U. S. C. § 151.

[12] The Examiner, the Referee, the Commission, the District Court, and presumably the Circuit Court of Appeals all found a "labor dis-pute" to have existed, at least before the arrival of the deadline dates.

before the Referee indicates that both of the above-mentioned companies made extensive preparations for the 1940 operations. In anticipation, equipment and supplies of the value of several hundred thousand dollars were purchased. Ships were prepared and held in readiness for the expeditions. The Referee found that these companies negotiated in good faith and failed to operate in Alaska during the 1940 season only because of their inability to negotiate satisfactory labor agreements before the passing of the deadline dates. There is evidence that the Alaska Packers Association expected to hire about two-thirds the number of workers in 1940 it had employed in 1939. But there is nothing in the record to establish that any of the claimants in this action would have been unemployed as a result of this contemplated curtailment in activity, or, if any of the respondents would have been affected, which of their number would have been unemployed. It appears that the Red Salmon Canning Company expected to use the same number of workers in 1940 as in 1939, or possibly a few more. Under these circumstances, we think that the Commission's finding that the unemployment was "due" to the labor dispute should stand insofar as it relates to the claimants indicated.

But a different situation is presented with reference to the respondents employed by the Alaska Salmon Company in 1939. That company has an establishment only at Bristol Bay. On April 30, three days before the deadline relating to the Bristol Bay operations, Alaska Salmon withdrew from the negotiations with the union and announced that it was unable to send an expedition to Alaska in 1940. The Referee found that the withdrawal was caused primarily by factors other than the company's inability to negotiate a satisfactory labor contract. At the hearings before the Referee, counsel for the company stipulated that, even though the other companies had negotiated a labor agreement with the union before the deadline

date, Alaska Salmon would have conducted no operations out of San Francisco in 1940 after its withdrawal from negotiations. We conclude that the record does not support the finding of the Commission that the respondents employed by the Alaska Salmon Company in 1939 were unemployed "due" to a labor dispute at the establishment at which last employed.

Respondents urge that, assuming their unemployment was due to a labor dispute, there was no labor dispute in active progress," within the meaning of the Act, after the passage of the deadline dates. It is argued that when the expeditions were abandoned by the companies, the dispute must necessarily have terminated since there was no possible way in which negotiations could have brought about a settlement. It should be observed, however, that the record does not reveal that negotiations abruptly terminated with the passing of the last deadline date. Conferences continued at Seattle in which both the companies and the union were represented. The respondents considered the negotiations sufficiently alive to make an offer of terms at least as late as May 29. Even if it be assumed that at some time within the eight-week period of disqualification the point was reached when all possibility of settlement disappeared, it does not follow that the Commission's finding of a dispute in "active progress" must be overturned. Here, as in *Labor Board* v. *Hearst Publications, Inc.*, 322 U. S. 111, 131 (1944), the question presented "is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially." To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. The "reviewing court's function is limited." All that is needed to support the Commission's interpretation is that it has

"warrant in the record" and a "reasonable basis in law." *Labor Board* v. *Hearst Publications, Inc., supra; Rochester Telephone Corp.* v. *United States,* 307 U. S. 125 (1939).

Applying these tests, we are unable to say that the Commission's construction was irrational or without support in the record. The Commission apparently views a dispute as "active" during the continuance of a work stoppage induced by a labor dispute. That agency might reasonably conclude that the unemployment resulting from such work stoppage is not of the "involuntary" nature which the statute was designed to alleviate, as indicated by the statement of public policy incorporated in the Act by the Territorial Legislature.[13] We see nothing in such a view to require our substituting a different construction from that made by the Commission entrusted with the responsibility of administering the statute.[14]

Nor can we accept the argument of the majority of the Court of Appeals that since negotiations between the companies and the workers were carried on in San Francisco and Seattle, the dispute could not be said to be "at" the

---

[13] The "Declaration of Territorial Public Policy" states that *"Involuntary unemployment* is . . . a subject of general interest and concern which requires appropriate action by the legislature." It is further stated that the public welfare demands the compulsory setting aside of unemployment reserves "for the benefit of persons unemployed *through no fault of their own."* Chapter 4, Extraordinary Session Laws of Alaska, 1937. (Italics supplied.)

Several state courts have concluded that the disqualification relating to unemployment due to a labor dispute is a reflection of the broad policy of the legislation to compensate only persons involuntarily unemployed. *Barnes* v. *Hall,* 285 Ky. 160, 146 S. W. 2d 929 (1940); *Deshler Broom Factory* v. *Kinney,* 140 Neb. 889, 2 N. W. 2d 332 (1942); *Sandoval* v. *Industrial Commission,* 110 Colo. 108, 130 P. 2d 930 (1942).

[14] *Labor Board* v. *Hearst Publications, supra; Rochester Telephone Corp.* v. *United States, supra.* Cf. *Social Security Board* v. *Nierotko,* 327 U. S. 358 (1946).

Alaskan establishments as required by the statute. So far as we are able to determine, this issue was injected for the first time by the opinion of the majority of the Court of Appeals. The contention does not seem to have been raised or pressed by respondents up to that point. The responsibility of applying the statutory provisions to the facts of the particular case was given in the first instance to the Commission. A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action.[15] Nor do we find the argument advanced below convincing on its merits. It is clear that the subject matter of the dispute related to the operation of the Alaskan establishments. As a result of the dispute, the normal activities involved in catching and canning salmon were not carried on throughout the 1940 season at any of those establishments. We do not consider significant the fact that the companies and the union did not negotiate at the canneries or on the ships in Alaskan waters. A legislature familiar with the nature of seasonal operations carried on in the Territory could hardly have been unaware of the fact that companies and workers customarily carried on negotiations far distant from the Alaskan establishments. It seems unlikely that it was intended that this ordinary and usual procedure should defeat the disqualification for benefits incorporated in the Act. Furthermore, it should be observed that the respondent union

---

[15] Section 6 (h) of the Act states that judicial review of the Commission's decision "shall be permitted only after any party claiming to be aggrieved thereby has exhausted his administrative remedies as provided by this Act." Cf. *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 50–51 (1938); *Regal Knitwear Co.* v. *Labor Board*, 324 U. S. 9, 13 (1945); *Phelps Dodge Corp.* v. *Labor Board*, 313 U. S. 177, 196–197 (1941).

voluntarily entered into the negotiations conducted at San Francisco and Seattle and at no time challenged the propriety of this practice. Thus if we assume with respondents that this issue is properly presented for consideration, we conclude that under the circumstances of this case the dispute was "at the factory, establishment, or other premises" in the sense intended by the Territorial Legislature.

For the reasons stated, the judgment of the Circuit Court of Appeals is affirmed insofar as it holds that the statutory eight-week period of disqualification is inapplicable to the individual respondents employed by the Alaska Salmon Company in 1939. In all other particulars, the judgment of the Circuit Court of Appeals is reversed and the case remanded to the District Court with instructions to remand for further proceedings pursuant to this opinion.