BROTHERHOOD OF RAILROAD TRAINMEN ON the MONONGAHELA CONNECTING RAILROAD COMPANY, Petitioner,

v.

RAILROAD RETIREMENT BOARD, the Monongahela Connecting Railroad Company, Intervenor.

No. 17508.

United States Court of Appeals Third Circuit.

Argued Feb. 19, 1969.

Decided May 6, 1969.

T. P. Shearer, Pittsburgh, Pa., for petitioner.

Myles F. Gibbons, Railroad Retirement Board, Chicago, Ill. (David B. Schreiber, Associate Gen. Counsel, Charles F. Mc-Laughlin, Asst. Gen. Counsel, Railroad Retirement Board, Chicago, Ill., on the brief), for respondent.

Joseph A. Katarincic, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa. (Hayes C. Stover, Pittsburgh, Pa., on the brief) for intervenor.

Before VAN DUSEN, ALDISERT and STAHL, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This petition seeks review of a decision rendered October 5, 1967, by the Railroad Retirement Board.[1] The Board held that all of the payments under a 1923 pension plan, as improved in 1956, of intervenor, The Monongahela Connecting Railroad Company (hereinafter the Company), were "attributable to the employer's contribution" within the meaning of the 1966 amendment to the Railroad Retirement Act, 45 U.S.C. § 228c(j) (2). The effect of this decision was to reduce the supplemental annuity to which certain employees of the Company, members of the petitioner, Brotherhood of Railroad Trainmen (hereinafter the Brotherhood, would otherwise have been entitled under the amendment.

The Railroad Retirement Act of 1937 established annuities for qualified retiring railroaders. 45 U.S.C. § 228. In the early nineteen sixties, railroad labor and management engaged in extended negotiations looking to the institution of a supplementary pension comparable to those existing in other major industries. These negotiations culminated in a 1966 agreement that the railroad employers would finance, for five years, a supplemental annuities program for employees retiring after July 1, 1966, who were already entitled to an annuity under the

1. We have jurisdiction of the petition under 45 U.S.C. § 228k, incorporating 45 U.S.C. § 355 (f).

1937 Act, and who were 65 or over, had completed 25 or more years' service, and had a current connection with the railroad industry at retirement. The parties requested Congress to enact legislation which would vest administration of the agreement in the Railroad Retirement Board and which would effectuate financing of the program by railroad employers through the imposition of an excise tax upon them to create a special fund.[2]

Several railroad employers, however, already had private, non-contributory pension plans for their employees. The labor and management groups agreed that it would be unfair to tax these employers in full for the supplemental annuities program, thereby "pyramiding" such annuities onto the benefits which they were already paying out under their private plans.[3] Accordingly, it was proposed that such employers be allowed a credit against the tax imposed upon them for the supplemental annuities fund, the credit to be equal to the particular employer's contribution to its private pension plan. This proposal was implemented in the following provisions of the draft bill, later amendments to the Railroad Retirement Act and the Railroad Retirement Tax Act, respectively:

"The supplemental annuity provided by this subsection for an individual shall, with respect to any month, be reduced by the amount of the supplemental pension, attributable to the employer's contribution, that such indi-vidual is entitled to receive for that month under any other supplemental pension plan: * * *." 45 U.S.C. § 228c(j) (2).

"Each employer of employees whose supplemental annuities are reduced pursuant to section 3(j) (2) of the Railroad Retirement Act of 1937 shall be allowed as a credit against the tax imposed by this subsection an amount equivalent in each month to the aggregate amount of reductions in supplemental annuities accruing in such month to employees of such employer. * * *." 26 U.S.C. § 3221(c).

Prior to enactment of the legislation, however, labor representatives apparently pointed out to Congress that some private pension plans described as "non-contributory" could in reality be financed by the employees. The Senate and House Committee Reports recognized this problem by stating that benefits payable under a private pension plan which are "offset by a decrease in wages" would not be deemed "attributable to the employer's contribution." [4] However, no provision to this effect was drafted into the bill itself.

In its decision of October 5, 1967, the Railroad Retirement Board set out the following standard:

"To carry out its obligation under the law, the Board determines that an employer's supplementary pension plan is attributable, in whole or in part, to contributions from employees if the in-

---

2. The proposed legislation is set out at 112 Cong.Rec. 20847 et seq. (1966), and is explicated in the Congressional Committee Reports, see U.S.Code Cong. & Admin.News, 89th Cong., 2nd Sess., p. 3575 et seq. (1966). Title I of the Bill as passed (P.L. 89-699) provided for the establishment of the supplemental annuities program. Title III imposed on each railroad employer an excise tax of two cents per man-hour worked and paid for, the resulting funds to be placed in a separate account at the Treasury and disbursed independently of the annuities payable under the 1937 Act.

3. See hearings on S. 3777, "Railroad Retirement Benefits," before the Subcom-mittee on Railroad Retirement of the Senate Committee on Labor and Public Welfare, 89th Cong., 2nd Sess., 37 (1966); hearings on H.R. 17285, "Railroad Retirement Act—Supplemental Benefits," before the Subcommittee on Commerce and Finance of the House Committee on Interstate and Foreign Commerce, 89th Cong., 2nd Sess., 27 (1966). See, also, U.S.Code Cong. & Admin.News, 89th Cong., 2nd Sess., pp. 3575, 3577, 3582-83 (1966).

4. S.Rep.No. 1718, 89th Cong., 2nd Sess. 3, 9 (1966); H.R.Rep.No. 2169, 89th Cong., 2nd Sess. 6, 11 (1966). U.S.Code Cong. & Admin.News, *supra*, footnote 3.

formation furnished to it shows that, by agreement between the employer and employees, (1) the pension is financed by specific deductions from the employees' wages or (2) the employees had the choice of accepting (i) an increase in wages or, in lieu thereof, (ii) a pension (or an increase in pension), and accepted the latter." (R. 73–74)

The formulation of this standard was occasioned by the facts of the instant case. The Company instituted a non-contributory pension plan in 1923, before the advent of collective bargaining. This plan, which provided that the Company would pay its entire cost and would have the right to alter or change it, continued unchanged until 1956. In that year, a contract was entered into by the Company and the Brotherhood as a result of collective bargaining. It provided, inter alia, that benefits payable under "the present Non-Contributory Pension Plan" would be increased as of October 1, 1957, and that "The Carrier agrees to provide pension benefits in accordance with [the new plan] * * *" This plan continues in effect today.

After passage of the supplemental annuities legislation in 1966, the Company took the position that all payments under the improved 1956 pension plan were "attributable to the employer's contribution" within the meaning of 45 U.S.C. § 228c (j) (2). The Brotherhood took its objections thereto before the Board, which determined, by letter of April 26, 1967, that no part of the payments under the 1956 plan were attributable to the employees.[5] The Brotherhood appealed, requesting a hearing. In its notice to the parties that the hearing would be held on June 15, 1967, the Board announced the standard quoted above as that which would govern the case. The hearing was duly held, all parties now before this court being represented. The Board held in its written decision that neither the "agreement" nor the "choice" described in its standard had been established.[6]

The Brotherhood objects to the Board's action in three distinct respects. The first contention is apparently directed to the type or quantum of proof the Board required. The Brotherhood complains of a statement in the decision that "[n]o concrete evidence" existed that it could have secured higher wages in the 1956 negotiations instead of the increased pension benefits. The record shows clearly that the Brotherhood was afforded every opportunity to submit anything it wished to the Board.[7] Such flexibility indicates that "concreteness" was not equated with admissibility or even with materiality. We think the term was merely descriptive of the quality of the information adduced and in no way departed from the standard of proof applicable in administrative proceedings generally. In any case, the Board's finding that no choice existed was supported

---

5. The Board recited that it had so decided on the basis of the material before it and the opinion of its Associate General Counsel. There is no contention here that this preliminary determination was made on an inadequate record. The Board, in its final decision in October 1967, stated that the April 1967 determination was made on the basis of evidence submitted in March (R. 2). And after carefully reviewing several of the items before the Board, the October decision concludes: "[t]he evidence and argument offered in the hearing [on June 15, 1967] were in the main the same as, or similar to, that which the parties had submitted earlier."

6. No contention was made, nor could there have been on this record, that "specific deductions" were taken from the employees' wages to finance the increased pension.

7. At the hearing's outset, the Board Chairman stated that rules of evidence would be suspended to enable the parties to offer whatever they might "deem proper". At its termination, he ordered the record held open for two weeks so that any party might submit additional material. And the decision provided that the matter would be reopened should evidence warranting a change be submitted.

by substantial evidence [8] and thus is conclusive upon us. See 45 U.S.C. § 355(f); Marmon v. Railroad Retirement Board, 218 F.2d 716 (3rd Cir. 1955).

■ The Brotherhood's second claim is that the standard was misapplied. The Board stated in its decision that the evidence did not establish the existence of an "express agreement" in 1956 giving the company's employees the required choice. The Brotherhood correctly points out that the Board's standard does not speak of an "express" agreement. As stated below, we need not decide whether the standard is valid for all cases and we conclude that, as applied here, it produces a fair and reasonable result.

■ Finally, the Brotherhood contends the standard is wrong. It urges us to direct the Board to revise it so that a pension plan will be held attributable to employees' contributions when it is shown they had a choice of accepting a pension or the "financial equivalent of the cost thereof." The Board's determination that certain pension payments are "attributable to the employer's contribution" within the meaning of 45 U.S.C. § 228c (j) (2) is to be accepted if it has "warrant in the record" and a "reasonable basis in law," and we so accept it. See National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); Gloss v. Railroad Retirement Board, 114 U.S. App.D.C. 177, 313 F.2d 568 (1962). It need not be the only reasonable determination, or even one that we, as a court of law, would reach. Unemployment Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946). Here, the Board has construed a provision of the Railroad Retirement Act by formulating and then applying a precise standard which has a reasonable basis in law. We decline to interfere with the process by which this administrative agency, more expert than we in its delegated area, has dealt with a problem peculiarly within its jurisdiction in announcing a standard for the guidance of employers and employees. Cf. Board v. Hearst Publications, *supra*. Any improper application of the announced standard on an inadequate record will be subject to judicial review should it occur.

In any event, whether this record is considered with respect to the Brotherhood's proposed standard or without the benefit of any standard, affirmance of the Board's decision would still be required. "Choice" remains an element of the standard which the Brotherhood would have us direct the Board to accept. Yet we find in the record no evidence, apart from self-serving declarations of leaders of the Brotherhood, that a choice between increased pension payments and other benefits was made available to the employees in 1956.

■■ Assuming that no standard existed, decision would turn on the meaning of the phrase, "offset by a decrease in wages," in the Senate and House Reports. These Reports and the testimony at the Congressional hearings give no clue as to what factual circumstances the language contemplates. However, the Brotherhood misses the mark in framing the issue before us as " * * * whether the employer gratuitously set up the plan * * * or whether the employees in effect financed it by foregoing a wage increase which was available to them as a result of collective bargaining". No pension increase agreed upon as a result of collective bargaining is truly gratuitous. Like every other demand in the total bar-

---

**8.** It is noted that the Company and the Brotherhood executed a contract on 2/22/66, specifically providing that the latter had the option to accept or reject the "Non-Contributory Pension Plan then effective for other employees represented by other organizations on this property" within 60 days of a meeting to be held on or about May 1, 1967, in which event the base rate of pay otherwise to become effective on 7/16/67 "shall be reduced by 9.3 cents per hour." There was no similar agreement in 1956.

**358**

gaining package, it is assigned a value by the parties, sometimes openly, for purposes of estimating costs so that proposals can be intelligently formulated.[9] Any agreed upon pension increase will necessarily be balanced by adjustments in the other benefits of the package; to this extent all pension plans are "offset by a decrease in wages." We agree with the Board that it would be illogical, in the face of the legislative determination to avoid "pyramiding," to hold, uniformly, all pension benefits attributable to the employees' contribution on the assumption that the employer's pension costs were in effect deducted from the employees' wages where both were the subject of collective bargaining. The Board argues, we think correctly, that the language in the Act and in the Congressional Reports, taken alone, is consistent with a construction that the employees must take an actual reduction, or expressly forego an increase, in wages in order to secure the pension increase, a situation clearly not present here. On this record, we conclude that affirmance of the Board's decision is required, irrespective of the universal applicability of its stated standard. The Board's construction, as applied to the facts of this case, was not "irrational or without support in the record." Unemployment Comm'n v. Aragon, *supra*, at 153–154, 67 S.Ct. at 250 (1946).

The decision of the Railroad Retirement Board will be affirmed.

9. Thus, in the course of negotiations in 1956, both the Company and the Brotherhood submitted written proposals in which the cost or value, respectively, of each item in the bargaining package was estimated on a cents-per-hour basis. Both parties listed the improvement in this pension plan as worth six cents. Though the record indicates that the company had predetermined a limit on what it was willing to spend on a final settlement, the above-mentioned proposals do not establish that the employees could have secured a wage increase in lieu of the increased pension, as contended by the Brotherhood. It is noted that the Company pointed out in a March 1967 letter to the Board that both parties agreed that an hourly rate increase in

wages is 40% more costly than its amount "because of related fringe and associated costs" which do not follow an increase in pension benefits. Similarly, at the June 15, 1967, hearing, the Company's representative stated:

"I am not in a position to say that if the pension was not granted in 1956, effective in 1957, *just* what would have come of that money. I would guarantee, however, as a member of the negotiating team, they would not have received six cents in wages. There may have been *something* in wages; but again when you negotiate on a cost basis for every penny that goes in wages, there are side costs that are affected * * *."

(See, also, R. 123).