NORTHWAY LANES, a co-partnership consisting of Ralph Kuris and Bessie Shull, and Marshull, Inc., a Michigan corporation, Plaintiffs-Appellants,

v.

HACKLEY UNION NATIONAL BANK AND TRUST COMPANY, a National Banking Association, Defendant-Appellee.

No. 71–1987.

United States Court of Appeals, Sixth Circuit.

July 18, 1972.

Arthur M. Rude, Muskegon, Mich., for appellants; Parmenter, Forsythe, Rude & Dethmers, Muskegon, Mich., on brief.

H. Winston Hathaway, Muskegon, Mich., for appellee; Landman, Hathaway, Latimer, Clink & Robb, Muskegon, Mich., on brief.

John P. Milanowski, Grand Rapids, Mich., L. Patrick Gray, III, Walter H.

Fleischer and Robert Feinson, Attys. Dept. of Justice, Washington, D. C., on brief amicus curiae for United States; John E. Shockey, Comptroller of the Currency, Washington, D. C., of counsel.

Before CELEBREZZE and PECK, Circuit Judges; and RUBIN, District Judge*.

CARL B. RUBIN, District Judge.

Sections 85 and 86 of the National Bank Act, 12 U.S.C.A., §§ 85 and 86,[1] prescribe the rates of interest that may be charged by national banking associations and declare that the receiving of a rate of interest greater than that allowed, when knowingly done, shall give rise to a statutory proceeding for double that amount of interest.

Appellants herein, Northway Lanes, a co-partnership consisting of Ralph Kuris and Bessie Shull, and Marshull, Inc., the successor corporation, brought this action under section 86 in the United States District Court for the Western District of Michigan, to recover from appellee the penalty imposed by that section. From an adverse judgment, 334 F.Supp. 723, they appeal.

This controversy began on November 10, 1967, when the appellee bank, a national banking association, loaned to appellants Kuris and Shull, both individually and doing business as a co-partnership under the name of "Northway Lanes," $600,000.00 for the construction and operation of an eight lane bowling alley. Because banking associations in Michigan are subject to limitations as to

---

* Hon. Carl B. Rubin, United States District Judge for Southern Ohio, sitting by designation.

1. Sections 85 and 86 of the National Banking Act, 12 U.S.C., §§ 85 and 86, provide as follows:

85. *Rate of Interest on loans, discounts and purchases.*—Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this title. When no rate is fixed by the laws of the State, or Territory, or District, the bank may take, receive, reserve, or charge a rate not exceeding 7 per centum, or 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has

to run. The maximum amount of interest or discount to be charged at a branch of an association located outside of the States of the United States and the District of Columbia shall be at the rate allowed by the laws of the country, territory, dependency, province, dominion, insular possession or other political subdivision where the branch is located. And the purchase, discount, or sale of a bona fide bill of exchange, payable at another place than the place of such purchase, discount, or sale, at no more than the current rate of exchange for sightdrafts in addition to the interest, shall not be considered as taking or receiving a greater rate of interest.

86. *Usurious interest—Penalty for taking—Statute of limitation.*—The taking, receiving, reserving, or charging a rate of interest greater than is allowed by the preceding section [85 of this title], when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill or other evidence of debt carries with it, or which has been agreed to be paid thereon. In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, twice the amount of the interest thus paid from the association taking or receiving the same: Provided such action is commenced within two years from the time the usurious transaction occurred.

the amount they may loan on real estate, two separate loans were arranged in the following manner: first, a mortgage note in the face amount of $350,000.00, secured primarily by the underlying real estate with the bowling alley equipment as additional collateral; and second, an installment note in the face amount of $337,500.00 of which latter amount $87,500.00 was interest reserved by the bank in advance. The primary security for this installment loan was the bowling alley equipment and a second lien was granted upon the improved real estate.

By the terms of the mortgage note, the appellants obligated themselves to pay the principal sum of $350,000.00, with interest at the rate of 7% per year for a term of seven years. The mortgage note was payable in monthly installments of $5,283.00, with the payments to be applied first to interest and then to principal. The mortgage note also reserved to the borrower the privilege of prepayment, subject to a 5% prepayment charge if prepaid during the year 1968, and reserved to the lender the right to charge a 4% late charge on any delinquent installment.

Interest on the installment note amounted to $7.00 per $100.00 per year. The note was payable in forty monthly installments of $8,437.50 each, commencing November 20, 1967, and continuing on the same day of each month except May, June, July and August of each year. It contained no specific provision allocating a specific principal or interest factor to each installment payment, but did contain provisions similar to the mortgage note with respect to prepayment and late charges. With regard to both the mortgage note and the installment note, the reservation by the lender of 7% interest was the maximum permitted under Michigan law.[2]

In addition to the above terms, the appellants obligated themselves to pay all out-of-pocket expenses incurred by the appellee bank in connection with both the real estate mortgage and the installment loans, and to furnish the bank with a land survey and a commitment of title insurance satisfactory to it. Pursuant to this agreement, the appellee

2. In Michigan the limit of interest on commercial real estate mortgage loans exceeding five years in duration is 7%. M.S.A. Section 19.15(1), M.C.L.A. § 438.31 provides in part that:

[T]he interest of money shall be at the rate of $5.00 upon $100.00 for a year, and at the same rate for a greater or less sum, and for a longer or shorter time, except that in all cases it shall be lawful for the parties to stipulate in writing for the payment of any rate of interest, not exceeding 7% per annum.

The limit on interest on industrial discount, or "add-on" loans is likewise 7% per year, subject to certain other restrictions. The relevant sections of M.S.A. § 23.766, M.C.L.A. § 487.38, provide that banks shall have the power:

(a) To loan money and deduct interest therefor in advance at the rate of 7% per annum, or less, on the entire amount of the loan from the date of disbursement thereof to the date of maturity of the last maturing installment thereof, and in addition to receive uniform weekly, semi-monthly or monthly repayment installments on said loan,

herein called "industrial loans," with or without an allowance of interest on such installments. If necessary, the amount of the final installment may be less than the amount of any previous installment. No such loan shall exceed 3% or $10,000 whichever is greater of the capital and surplus of the bank, nor be made for a longer period than 60 months from the date thereof, and the aggregate principal amount of such loans at any time shall not exceed 25% of the total deposits of the bank, whichever is the greater. Upon proper showing and consistent with sound banking practice, the commission may waive said restrictions.

(b) To charge the borrower in connection with loans made pursuant to this section $1.00 for each $50.00 or fraction thereof for expenses, including any examination or investigation of the character and circumstances of the borrower, co-maker or surety and the drawing and taking acknowledgement of necessary papers. No charge shall be collected unless a loan shall have been made and no charge shall exceed $15.00.

bank charged the borrowers $1,595.00 to cover the expenses of the loan. These expenses consisted of $876.00 for title insurance, $125.00 for land survey, $575.00 for attorney's fees for the bank's attorney, $14.00 for recording the new mortgage, $3.00 for title search, and $2.00 for security instrument filing fee.

The partnership, in the latter part of 1967 and the early part of 1968, made one payment on the mortgage note in the amount of $5,448.50 and four payments on the installment note of $8,437.-50 each. On February 27, 1968, appellant corporation, Marshull, Inc., a Michigan corporation, was organized with the former partners as officers and sole stockholders thereof. On March 1, 1968, the partnership conveyed the business real estate to the corporation by deed, subject to the real estate mortgage to the appellee bank, which mortgage the appellant corporation assumed and agreed to pay. The personal property covered by the security agreement was also conveyed by the partnership to the corporation, by bill of sale executed the same day. However, no arrangement was made between the appellee bank and the corporation to relieve the co-partners Kuris and Shull individually from liability on the existing indebtedness.

Subsequent to March 1, 1968, the record shows that at least one payment, in the amount of $8,437.50, was made by the newly formed corporation on a Marshull, Inc. check. On April 16, 1968, both notes were paid off in full. Included in the final payment amount of $592,073.04 was a prepayment charge of $30,000.00, of which $17,500.00 was attributable to the mortgage note and $12,500.00 to the installment note.

Having discharged their indebtedness to the bank in full, appellants Kuris and Shull, in their capacity as partners of Northway Lanes, and Marshull, Inc., filed a complaint in the United States District Court for the Western District of Michigan under the provisions of Sections 85 and 86 of the National Bank Act, *supra*, n. 1, alleging that the deduction by the appellee bank of interest in advance, the assessment against the appellants of $1,595.00 in so-called "closing charges," and the imposition of a $30,000.00 prepayment charge separately and collectively constituted usurious interest, for which they sought double damages under 12 U.S.C.A. § 86, or twice the following amount:

| | |
|---|---:|
| Interest at 7% for 158 days | $25,071.62 |
| Prepayment charges | 30,000.00 |
| Title insurance on mortgage's interest only | 876.00 |
| Land survey | 125.00 |
| Bank's attorney fees | 575.00 |
| Recording new mortgage (2 counties) | 14.00 |
| Financing search | 3.00 |
| Security instrument filing fee | 2.00 |
| TOTAL | $56,666.62 |

The District Court, by order of July 12, 1971, concluded that none of appellants' contentions were meritorious and dismissed the action after a trial upon the merits. From this order, appellants have prosecuted a timely appeal.

I

The threshold question raised in this appeal involves the standing of the appellants to assert a cause of action founded upon usury. Under Michigan statute, as construed by the Michigan courts, a corporation may, by written agreement, contract to pay a rate of interest in excess of the general legal rate. If it does, such corporation is barred from asserting the defense of usury, see M.C.L.A. § 450.78, or from in any way seeking "to avoid its own contract by showing that it is usurious." Thomas, Inc. v. Union Trust Co., 251 Mich. 279, 231 N.W. 619 (1930). Appellee argued below and reasserts on appeal that Marshull, Inc. as the successor corporation to the co-partnership consisting of appellants individually, agreed in writing to assume and pay the indebtedness owed to the bank, that the bulk of all payments were in fact paid by Marshull, Inc., and, therefore, that as to these payments at least, a cause of action in usury cannot lie on its behalf.

The District Court below found, as a matter of fact, first, that during the period of corporate formation and conveyance of real and personal property by the partnership to the corporation, the appellee bank was not notified and had no knowledge that incorporation and assumption of the partnership debts had occurred; and second, that no arrangement was ever made between the bank and Marshull, Inc. to relieve the appellants individually from liability on the existing indebtedness. The Court further concluded that the obligation on the notes and the mortgage, so far as the bank was concerned, remained at all times with the partnership and the individuals, and that payment was made on their account and to their benefit even though channeled through the corporation to enable the loan to be paid off. We agree. The relationship of debtor and credit was created when individuals Kuris and Shull, doing business as a partnership, borrowed money from the Hackley Union National Bank & Trust Company. No substitution for such debtors was ever made and that relationship never ended. Partners who continue to hold themselves out as such after the formation of a successor corporation cannot escape responsibility for their pre-existing contracts in the absence of actual notice to creditors that the partnership has been dissolved. Peninsular Store Company v. Crane, 226 Mich. 130, 197 N.W. 693 (1924); Sibley v. Parsons, 93 Mich. 538, 53 N.W. 786 (1893); 40 Am.Jur. Partnerships § 81, p. 186; Annot. 89 A.L.R. 986. Neither should such partners be fettered with a corporate inability to assert usury where such corporation has not replaced either the individual or the partnership as principal debtor.

In the present case, evidence was adduced that a single corporate check, dated April 8, 1968, in the amount of $8,437.50, and bearing the dual caption of "Marshull, Inc./Northway Lanes," [3] was received by the lender bank, and seen personally by its president. The evidence showed also that the bank had no specific knowledge of corporate takeover, was never notified by the appellant co-partners of their intention to dissolve the partnership, and at all times carried on its books the names of Kuris & Shull, individually and as co-partners, as the principal obligors on the outstanding indebtedness. Finally, the form of endorsement on the final payment check [4] is evidence of the partners' explicit recognition of their continuing liability on the underlying debt.

The Court must therefore conclude that the acts of the appellant co-partners were insufficient to place the appellee bank on notice of dissolution or to apprise it of corporate assumption of liability. Although in light of its express assumption of partnership liabilities, the successor corporation might also have been held accountable by the bank for the remaining debt, see Piette v. Bavarian Brewing Co., 91 Mich. 605, 52 N.W. 152 (1892); Wiles v. B. E. Wallace Products Corp., 25 Mich.App. 300, 181 N.W.2d 323 (1970); nevertheless, the bank was justified in continuing to look to the partners individually for payment.[5] We therefore proceed to consider the merits of the case.

---

3. Previous checks issued to the appellee bank bore the caption "Northway Lanes" or in one case, "New Northway Lanes."

4. The final payment check, payable to Marshull, Inc., the successor corporation, was restrictively endorsed to the order of appellants as co-partners of Northway Lanes and then to the order of the Hackley Bank.

5. In fact, the sale of the partnership assets to Marshull, Inc., without the knowledge and consent of the appellee bank, constituted a breach of the express terms of the security agreement underlying the loan, covenant five of which obligated the debtor not to "sell or attempt to sell or otherwise transfer or dispose of the Collateral or any interest therein without written consent of Secured Party." (See R. 147). Upon dissolution of the partnership, the bank would have been within its rights had it accelerated the loan (See R. 151).

A finding of continuing liability on the part of the individual partners is also

## II

Appellants' first contention, that the appellee's reservation in advance of $87,500.00 interest on the $250,000.00 installment note constituted usurious interest, requires little discussion. The figure $87,500.00 was reached by the bank in the usual manner: the maximum legal interest rate of 7% was applied to the principal amount of the loan $250,000.00, to yield a yearly interest figure of $17,500.00. Since the term of the loan was for five years, this yearly interest was multiplied by a factor of five to obtain the total interest on the loan, $87,500.00.[6] This figure was then added in advance to the principal amount of the loan, yielding a face amount of $337,500.00, to be amortized in forty equal installments over a five year period.

It has long been established that the taking of interest advance at the legal rate, upon discounting a note at a bank, is not usurious. See, Fleckner v. United States Bank, 21 U.S. 338, 8 Wheat 338, 5 L.Ed. 631 (1823); Evans v. National Bank of Savannah, 251 U.S. 108, 40 S. Ct. 58, 64 L.Ed. 171 (1919). See, generally, 6 Michie on Banks & Banking, Ch. 11, § 33, at 282–284. This device, variously called "discounting" or "add-on" loaning, is permitted by statute in a number of states, and is expressly allowed to National Banks organized and operated under Title 12, United States Code. See 12 U.S.C.A. § 85, supra, n. 1; see, also, 12 U.S.C.A. § 24.[7]

These statutory provisions have been broadly construed. In Evans v. National Bank of Savannah, supra, by a 6–3 decision, the Court approved the taking of interest in advance at the maximum legal interest rate by national banks even if located in states which prohibited their own state banks, competing in a limited loan market, from doing the same. The Court noted that discounting is an "ancient and commonly accepted doctrine," sanctioned by common law custom and not dependant upon federal statute or state law. Id., at 114, 40 S. Ct. 58.

Appellants acknowledge that, under Michigan statute as well, appellee might have reserved interest in advance, but maintain that in order to do so, it had to comply with the other restrictions of the Michigan enabling statute, including limitations on the amount of the loan and the charging of closing expenses. See M.S.A. § 23.766, M.C.L.A. § 487.38, supra, n. 2. This argument misses the point. Under the reasoning of Evans, supra, appellee's right to charge interest in advance arises inde-

---

supported by the mortgage agreement itself, in which the borrowers covenanted as follows:

"TENTH: In the event ownership of the mortgaged premises, or any part thereof, becomes vested in a person or persons other than Mortgagor, Bank, its successors and assigns, may, without notice to Mortgagor, deal with such successor or successors in interest with reference to this mortgage, and the note hereby secured, in the same manner as with Mortgagor, without in any way releasing, discharging or otherwise affecting Mortgagor's liability hereunder, or for the debt hereby secured. No sale of the premises hereby mortgaged and no forbearance on the part of Bank, its successors and assigns, and no extension of the time for the payment of the debt hereby secured, given by Bank, its successors or assigns, shall in any way whatsoever operate to release, dis-

charge, modify, change or affect the original liability of Mortgagor herein, either in whole or in part." R. 139, 140 [emphasis supplied]

6. In terms of simple interest, this represented an interest rate of roughly 13½% (See R. 86).

7. § 24. Corporate Powers of Associations

"Upon duly making and filing articles of association and an organization certificate a national banking association . . . shall have power — . . .

Seventh. To exercise by its board of directors or duly authorized officer or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt . . . ." [emphasis supplied].

pendent of state laws which are binding upon state banks. Appellants' first contention, therefore, is not meritorious.

## III

Appellants' second contention is that $1,595.00 in closing costs were properly the charges of the lender and that under Michigan law where the maximum legal interest rate is charged, the imposition of the additional burden of these charges upon the borrower is tantamount to usury.

There is no question that if a national banking association were to be held solely to the standard of a state bank (other than a savings and loan association), such add-ons would be usurious. In November of 1967, at the time this transaction was entered into, state banks generally in Michigan were prohibited from charging expenses incurred in the making of loans in an amount greater than $15.00. See, M.S.A. § 23.766(b), M.C.L.A. § 487.38(b), *supra*, at n. 2; see also, Panos v. Smith, 116 F.2d 445 (6th Cir. 1940); Schumacher v. Lawrence, 108 F.2d 576 (6th Cir. 1940), and Michigan cases cited therein. But the Michigan legislature, by statute enacted in 1965, specifically amended its law to permit a specific class of state lenders, savings and loan associations, to charge to its borrowers all reasonable and necessary expenses incurred in connection with the making or closing of real estate loans. The question raised by this appeal is whether national banking associations, organized and operated pursuant to Title 12, United States Code, may do likewise.

The National Bank Act of 1864, 13 Stat. 99, substantially amended and replaced the National Currency Act of 1863, 12 Stat. 665. The paramount intention of both of these statutes was to " . . . give every possible support to the public credit . . . " by a uniform currency " . . . furnished by national associations, organized under a general act of Congress . . . . " See, Abraham Lincoln, Special Message on Financing the War, Senate Journal, pp. 121–122 (37th Cong., 3rd Sess., Jan. 17, 1863). The legislative history of this statute indicates a Congressional intent to give national banks special competitive advantages over state banks, by permitting national banks to charge interest at the highest rate available to lenders generally in each respective state. See Cong. Globe, 38th Cong., 1st Sess., pp. 2123–2127. The operative clause of the statute, permitting national banking associations to "take, receive, reserve and charge . . . interest at the rate allowed by the law of the state . . . where the bank is located," was construed by Senator Sherman, a principal drafter of the act, as follows:

I know that the amendment as agreed upon in the Committee on Finance was well and carefully considered, and was intended to confer on these national banks the same privileges that are conferred by the laws of the States on other *associations and individuals*, and therefore, to avoid the controversy, I will move to reconsider the vote on the amendment proposed by the Senator from Iowa which was adopted, and let us have the original amendment stand just as it was reported from the committee, which I know was considered carefully, and which *will allow those national banks the same rate of interest as is provided for by the local law for the people within their own States*. If the States choose to change their law, they can change it at any time. My own preference, however, as I have already stated, is to establish a uniform rate of interest by our law; but having been overruled on that point, *I prefer now to place the national banks in each state on precisely the same footing with individuals and persons doing business in the State by its laws*. [emphasis added] (*Id.* at 2126).

Appellants contend that 12 U.S.C. § 85 restricts the rate of interest national banks may charge to the rate established by state law for state "banks";

that savings and loan associations are not "banks"; and that national banks, accordingly, may not charge a borrower interest which a savings and loan association concededly could charge under Michigan law on the same type of loan. The legislative history of the act simply does not support this construction. Indeed, an amendment to Section 30 (the predecessor to the present Section 85) of the Act, designed to put national banks "on precisely the same footing with the state banks so far as this matter of taking interest is concerned," was expressly rejected by the Senate. See Cong.Globe, 37th Cong., 1st Sess., p. 2126 (remarks of Sen. Doolittle). The reference in Section 30 to the "rate allowed by the laws of the State," was not intended to be limited to a state's general usury rate but was meant to include any exceptions to that rate established for special transactions or special classes of lenders. See, Cong.Globe, 38th Cong., 1st Sess., pp. 2123–2126 (remarks of Sen. Grimes). The legislative history of Section 85 therefore requires the conclusion that national banks may charge as much interest as savings and loan associations are allowed to charge on equivalent transactions by Michigan law.

This conclusion is clearly supported by the judicial constructions that the act has received. In Tiffany v. National Bank of Missouri, 85 U.S. 409, 18 Wall. 409, 21 L.Ed. 862 (1873), a national bank had charged interest at an annual rate of 9%. Missouri law limited state banks to an annual rate of 8% but authorized other persons to charge up to 10%. The plaintiff brought an action under Section 30 of the National Banking Act, contending that the defendant bank was restricted to the rate of interest provided for state banks of issue. The Supreme Court rejected this claim, holding that a national bank was not so restricted where other "lenders" or "persons" were allowed by state law to charge a higher rate of interest. In so holding the Court noted as follows:

> The Act of Congress is an enabling statute, not a restraining one

* * *. There are three provisions in Section 30 each of them enabling * * *. It speaks of allowances to national banks and limitations upon state banks, but it does not declare that the rate limited to state banks shall be the maximum rate allowed to national banks. * * * It cannot be doubted, in view of the purpose of Congress in providing for the organization of national banking associations, that it was intended to give them a firm footing in the different states where they might be located. It was expected they would come into competition with state banks, and it was intended to give them at least equal advantages in such competition. * * * Obviously if state statutes should allow to their banks of issue a rate of interest greater than the ordinary rate allowed to natural persons, national banking associations could not compete with them, unless allowed the same. *On the other hand, if such associations were restricted to the rates allowed by the statute of the State to banks which might be authorized by state laws, unfriendly legislation might make their existence in the state impossible.* A rate of interest might be prescribed so low that banking could not be carried on except at a certain loss. *The only mode of guarding against such contingencies was that which, we think, Congress adopted. It was to allow national associations the rate allowed by the state to natural persons generally, and a higher rate, if state banks of issue were authorized to charge a higher rate.* * * * [Section 30] gives advantages to national banks over their state competitors. It allows such banks to charge such interest as state banks may charge, and more, if by the laws of the state more may be charged by natural persons. [emphasis added.]

See, accord, First National Bank of Mt. Pleasant v. Duncan, 9 Fed.Cas. No. 4,804 pp. 91, 93 (C.C.W.D.Penn.1878); Daggs v. Phoenix National Bank, 177 U.S. 549,

555, 20 S.Ct. 732, 44 L.Ed. 882 (1900); Hiatt v. San Francisco National Bank, 361 F.2d 504 (9th Cir. 1966); Rockland-Atlas National Bank of Boston v. Murphy, 329 Mass. 755, 110 N.E.2d 638 (1953).

If, as the above cited cases indicate, it was the purpose of the Banking Act to protect national banks from potentially discriminatory legislation by state legislatures, that principle is of controlling significance in the case at bar. In 1965, the Michigan legislature amended its laws to permit savings and loan associations to: "require borrowing members to pay all reasonable and necessary charges incurred in connection with the making, closing, disbursing, expending, readjusting, or renewing of real estate loans, property improvement loans, and educational loans," further providing that such charges "shall be in addition to interest authorized by law and shall not be deemed to be a part of interest collected or agreed to be paid . . . within the meaning of the law of this state . . . ." See, M.S.A. § 23.-540(379), M.C.L.A. § 489.779.[8] During the same period in 1965, savings and loan associations organized in the state of Michigan were granted broad authority to participate in the industrial real estate loan market, subject only to the restriction that such real estate loans not exceed in value 80% of the appraised value of the underlying security. See M.C.L.A. § 489.769 (P.A.1967, No. 96, § 1, Eff. June 21, 1967, repealing § 489.755). Since the above provisions operate to give Michigan savings and loan associations, a specific class of lender, a competitive advantage in the commercial real estate mortgage market, it is the opinion of this Court that national banking associations organized in the State of Michigan and making similar commercial real estate loans, should be accorded the same treatment.

■ In this regard, the Court notes that although the loan in the instant case was separated into two parts, both were in fact commercial real estate loans within the meaning of Michigan law.[9] Similarly, the expenses charged in this case to the borrower, including the cost of obtaining title insurance, land survey, mortgage recording, financing search and reasonable attorney's fees, were never allocated as between the so-called "industrial" loan and the real estate mortgage loan and in fact constitute the ordinary charges which are made in connection with commercial real estate mortgage loans. Had not the appellee

8. "Sec. 379. (1) Every association and every federal savings and loan association, except as federal laws or regulations provide otherwise, may require borrowing members to pay all reasonable and necessary charges incurred in connection with the making, closing, disbursing, extending, readjusting, or renewing of real estate loans, property improvement loans and educational loans.

"(2) The charges authorized by this section shall be in addition to interest authorized by law, and shall not be deemed to be a part of the interest collected or agreed to be paid on such loans within the meaning of any law of this state which limits the rate of interest which may be exacted in any transaction." P.A.1964, No. 156, § 379, Eff. Jan. 1, 1965, as amended P.A.1965, No. 118, § 1, Imd. Eff. July 8."

9. A "real estate loan," within the meaning of the Savings and Loan Act of 1964, means "any loan or other obligation secured by real estate, whether in fee or in a leasehold extending or renewable automatically for a period of at least 15 years beyond the date specified for the final principal payment of the loan or obligation or *any transaction out of which a lien or claim is created against the real estate.*" [emphasis added] Similarly, real estate loans made pursuant to the Financial Institutions Act by banks generally, are defined as follows: "A loan secured by real estate within the meaning of this section shall be in the form of an obligation or obligations secured by mortgage, trust deed, or other such instrument upon real estate . . . ." M.C. L.A. § 487.73. Each of the loans in the present case, although styled "industrial" loan and "mortgage" loan, come within the meaning of the above sections, since they were secured by the *same* underlying real estate; i. e., the land upon which the bowling alley was built, the building itself, and the bowling fixtures contained therein.

bank styled part of its loan as an "industrial" loan, the conflict between the restrictive closing costs provisions of M.S.A. § 23.766(b), M.C.L.A. § 487.-38(b), *supra*, n. 2, and the provisions of the Savings & Loan Associations Act, M.S.A. § 23.540(379), M.C.L.A. § 489.-779, would not have arisen. In this Court's view, given the nature of the expenses charged, the former statute cannot be considered controlling.

In interpreting the meaning and intent of 12 U.S.C. § 85, the District Court below concluded that:

"Since a savings and loan association can in fact charge 7% interest and in addition thereto * * * require a borrower to pay all reasonable and necessary charges incurred in connection with the making, closing and disbursing of real estate loans, it is the opinion of the court that a national banking association operating within the State of Michigan may do so also. To construe the Act otherwise would place a national bank in a competitively inferior position not contemplated by the federal statute."

The District Court's ruling is supported by the administrative interpretations of Comptrollers of the Currency over many years. We note in passing Ruling 7.-7310, 12 C.F.R. § 7.7310, 36 F.R. 17015, which provides as follows:

"A national bank may charge interest at the maximum rate permitted by state law to any competing state-chartered or licensed lending institution. If state law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rate is subject only to the provisions of state law relating to such class of loans that are material to the determination of the interest rate. For example, a national bank may lawfully charge the highest rate permitted to be charged by a state-licensed small loan company or morris plan bank, without being so licensed."

The above interpretations, made by an office charged with the responsibility of promulgating reasonable regulations pursuant to the National Banking Act, and supported by the legislative history of the Act and by the Supreme Court's decision in *Tiffany, supra*, are entitled to deference by this Court. See, Unemployment Compensation Commission v. Aragan, 329 U.S. 143, 153, 154, 67 S.Ct. 245, 91 L.Ed. 136; F.H.A. v. The Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132; Udall v. Tallman, 380 U.S. 1, 17, 85 S.Ct. 792, 13 L.Ed.2d 616. The fact that savings and loan associations may be organized and operated in a manner different from banks generally does not, contrary to appellant's suggestions, alter the fact that such associations should be treated as "competing state-chartered or licensed lending institution[s]," within the meaning of Ruling 7.7310, *supra*. The conclusion is inescapable that the National Bank Act accorded national banks the right to charge the interest rate afforded their state competitors whether the competitor was a state bank or other non-bank lender. See, Tiffany v. National Bank of Missouri, *supra*. Accordingly, appellants' second contention is without merit.

### IV

Appellants argue finally that the assessment by the appellee bank of $30,000.00 in prepayment penalties constituted usury, because taken on an otherwise usurious loan. Appellants concede that prepayment penalties are not generally considered interest and that when charged in addition to maximum interest do not make an *otherwise nonusurious* loan usurious. See, 75 A.L.R.2d 1265, 130 A.L.R. 73, citing cases. Since the Court has concluded that the loans herein were not usurious, this question need not be considered.

For the reasons above stated, the judgment of the District Court is hereby affirmed.